# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:11-cr-00082** |
| | ) | **Judge Trauger** |
| **[1] TRAVIS GENTRY** | ) | |
| **[2] BETTY GENTRY** | ) | |
| **[7] PATRICK DEWAYNE SMITH** | ) | |
| | ) | |

## MEMORANDUM

Defendant Betty Gentry has filed a Motion to Suppress Title III Wiretap Search Warrants (Docket Nos. 846, 862) with a supporting Memorandum (Docket No. 863), in which co-defendants Travis Gentry and Patrick Dewayne Smith have joined (Docket Nos.848, 854-56).[1] The government has filed a Response in opposition. (Docket No. 904). On July 9, 2012, the court held a hearing concerning the motion. For the reasons stated herein, the motion will be denied.

## BACKGROUND

In the fall of 2005, federal and local authorities began investigating a drug trafficking organization ("the Gentry DTO") that was believed to be operating within the Middle District of Tennessee.[2] In May 2010, the United States sought and obtained a wiretap for a phone utilized by defendant Travis Gentry. The United States subsequently sought and obtained additional

---

[1]Defendant Channin Randolph originally joined the motion, as well (Docket Nos. 865-66). However, he later entered a plea petition, which the court accepted. (Docket No. 899.)

[2]Although the government's investigation began in the fall of 2005, it appears that there may have been a period of investigative inactivity between early 2006 and the fall of 2009.

wiretaps for other phones utilized by defendants Travis Gentry and Kejuana Latrese McCutcheon. The government intends to use evidence derived from those wiretaps at trial against four defendants, including Travis Gentry, Betty Gentry, and Patrick Dewayne Smith ("defendants").[3] The defendants now move to suppress that evidence, contending that the affidavits submitted in support of the applications for each wiretap did not establish sufficient necessity or probable cause.[4]

The government obtained the wiretaps at issue through eight successive applications (hereinafter "First Application," "Second Application," *etc*.), each of which was approved by the Chief Judge of this court ("Issuing Judge") in a separate, sealed matter (Crim. No. 3:10-SM-0078 (TJC), hereinafter "SM Docket No. [X]"). The Issuing Judge authorized wiretaps for the following telephones:

- Target Telephone 1 ("TT1") (authorization granted May 24, 2010), a cell phone used by Travis Gentry. (SM Docket Nos. 1 ("First Application") and 2 (Order granting First Application).)[5]

---

[3]The defendants are each charged in the Second Superseding Indictment with multiple criminal offenses, including, *inter alia*, two or more of the following offenses: conspiracy to distribute and possess with intent to distribute controlled substances, conspiracy to commit money laundering, possession of firearms in furtherance of a drug conspiracy, possession of cocaine, possession with intent distribute cocaine, using or maintaining a place to manufacture and distribute controlled substances, making a place available to manufacture, store, and distribute controlled substances, and being a felon in possession of a firearm. (Docket No. 910, Attachments 1, 2, and 7.)

[4]Originally, Betty Gentry also asserted that, after obtaining the wiretaps, law enforcement officials failed to adequately minimize their interception of communications on the wiretapped phones. Following the court's hearing concerning the Motion to Suppress, Betty Gentry struck this argument from her motion. (Docket No. 931.)

[5]The government sought and obtained a renewal of the TT1 wiretap in its Third Application. (SM Docket Nos. 13-14.)

- Target Telephone 2 ("TT2") (authorization granted July 8, 2010), a cell phone used by Travis Gentry. (SM Docket Nos. 7 ("Second Application") and 8 (Order granting Second Application).)

- Target Telephone 3 ("TT3") (authorization granted August 12, 2010), a cell phone used by Travis Gentry. (SM Docket Nos. 13 ("Third Application") and 14 (Order granting Third Application).)[6]

- Target Telephone 4 ("TT4") (authorization granted October 8, 2010), a cell phone used by Kejuana McCutcheon. (SM Docket Nos. 19 ("Fourth Application" and 20 (Order granting Fourth Application).)[7]

- Target Telephone 5 ("TT5") (authorization granted on December 13, 2010), a cell phone used by Kejuana McCutcheon. (SM Docket Nos. 27 ("Fifth Application") and 28 (Order granting Fifth Application).)[8]

- Target Telephone 6 ("TT6") (authorization granted on January 11, 2011), a cell phone used by Travis Gentry. (SM Docket Nos. 36 ("Sixth Application" and 37 (Order granting Sixth Application).)

In support of each wiretap application, the government attached both an authorization letter from the Department of Justice ("DOJ") and an affidavit executed by James Goodman, a Task Force Officer ("TFO") assigned to the Nashville District Office of the Drug Enforcement Administration ("DEA"). The court has reviewed the wiretap applications and supporting materials, comprising several hundred pages of information. Because of their length, the court will only discuss the most relevant facts here.

## ANALYSIS

---

[6]The government sought and obtained a renewal of the TT3 wiretap in its Fourth, Fifth, Seventh, and Eighth Applications. (SM Docket Nos. 19-20, 27-28, 39 ("Seventh Application") and 40 (Order granting Seventh Application), and 59 ("Eighth Application") and 60 (Order granting Eighth Application).)

[7]The government sought and obtained a renewal of the TT4 wiretap in its Fifth, Seventh, and Eighth Applications. (SM Docket Nos. 27-28, 39-40, and 59-60.)

[8]The government sought and obtained a renewal of the TT5 wiretap in its Seventh and Eighth Applications. (SM Docket Nos. 39-40 and 59-60.)

The defendants contend that all evidence obtained by law enforcement as a result of the aforementioned wiretap authorizations should be suppressed on three grounds: (1) the affidavits from TFO Goodman filed in support of each application failed to demonstrate the requisite necessity for the requested wiretaps; (2) the affidavits from TFO Goodman filed in support of each application failed to establish probable cause for each wiretap; and (3) law enforcement officials failed to minimize adequately the interception of communications over the target telephones.

## I.     Necessity and Probable Cause.

### A.     Legal Standard

In analyzing whether the government met the necessity and probable cause requirements under Title III, the court must accord "great deference" to the determination of the issuing judge. *United States v. Corrado*, 227 F.3d 528, 539-40 (6th Cir. 2000) (applying standard to necessity analysis); *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988) (applying standard to probable cause analysis).  Thus, "the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Corrado*, 227 F.3d at 539 (quoting *Alfano*, 838 F.3d at 162).  Accordingly, "neither a trial judge not an appellate court may exclude evidence gathered under a lawfully issued warrant solely on the basis that those judges would not have issued the warrant had they been in the magistrate's place." *Alfano*, 838 F.2d at 163.

In analyzing an affidavit in support of a search warrant, "the courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).  Thus, the court should not consider

paragraphs of the affidavit in isolation, but instead should analyze whether the facts presented in the affidavit, read as a whole, provide the requisite basis for the issuing judge's decision. *United States v. Landmesser*, 553 F.2d 17, 19-21 (6th Cir. 1977), *cert denied*, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977)..

B.      **Supporting Affidavits**

Each application seeking authorization to intercept the wire communications of individuals believed to be members of the Gentry DTO ("the target subjects") is supported by an affidavit executed by TFO Goodman.  In turn, each affidavit discusses, among other things, the following subjects: (1) TFO Goodman's experience and background; (2) the identities of the target subjects; (3) the offenses that the target subjects allegedly had committed, were committing, or would commit (either directly or by aiding and abetting); (4) the background of the confidential sources utilized in the investigation of the Gentry DTO; (5) the background of the investigation; (6) the facts that TFO Goodman believed established probable cause for the wiretap, including information obtained from multiple confidential sources, controlled narcotics transactions, monitored and/or consensually recorded telephone conversations involving target subjects, telephone toll analysis, physical and remote surveillance, and, in many of the affidavits, excerpts of intercepted telephone conversations over particular target telephones; (7) the need for intercepting wire communications; (8) the results of employing alternative investigative techniques; (9) the reasons why certain investigative techniques were not employed; and (10) minimization.  In support of their Motion to Suppress, the defendants focus most of their arguments on the content contained in the affidavit executed by TFO Goodman in support of the government's First Application ("First Affidavit").  Accordingly, the court will summarize in

detail the contents of the First Affidavit. Additionally, where relevant, the court will address additional information contained in the subsequent affidavits (hereinafter, "Second Affidavit," "Third Affidavit," etc.).

1. **First Affidavit**

    a.    Affiant's Experience and Involvement in the Gentry DTO Investigation

In the First Affidavit, TFO Goodman explains that the target subjects under investigation are believed to be members of the Gentry DTO, a drug trafficking organization operating within this judicial district that engages in the distribution of cocaine and marijuana. (First Affidavit ¶ 14.) TFO Goodman had worked as a police officer for the Metropolitan Nashville Police Department ("MNPD") for twenty-eight years, after which, as of the date of the First Affidavit, he had served for four years as a TFO for the Nashville District Office of the DEA. (*Id.* ¶ 2.)[9] TFO Goodman had participated in several long-term, complex investigations involving drug trafficking in cocaine, cocaine base, marijuana, heroin, and money laundering offenses. (*Id.*) From his experience, he understood the methods individuals and drug trafficking organizations use to purchase, transport, store, and distribute illegal drugs and their proceeds. (*Id.*) In the course of his investigations, he had utilized a number of investigative techniques, including, but not limited to, cooperating sources, source debriefings, physical surveillance, telephone toll

_____

[9]In addition, for ten of the twenty-eight years that he was employed by the MNPD, Goodman was assigned to serve as a TFO for the Nashville District Office of the DEA (*id.*), apparently in a collaborative effort between federal and local law enforcement.

analysis, and electronic surveillance. (*Id.*) TFO Goodman's personal participation in the investigation began in the fall of 2009.[10] (*Id.* ¶ 3.)

> b.  Target Offenses and Goals of the Investigation

The First Affidavit provided that "there is probable cause to believe that the Target Subjects have committed, are committing, and will continue to commit the following offenses:" (1) distribution and possession with intent to distribute controlled substances, including cocaine and marijuana; (2) the unlawful use of communication facilities in committing or facilitating the commission of a Title 21 felony offense; (3) conspiracy to distribute controlled substances, including cocaine and marijuana; and (4) money laundering and conspiracy to commit money laundering. (First Affidavit ¶ 5.) It also stated the goals of the investigation, which, in essence, included: (1) determining the nature, scope, and methods of operation of the drug trafficking activities of the Gentry DTO; and (2) identifying all of the members of the Gentry DTO and any associated conspirators. (*See id.* ¶ 35.)

> c.  The Two Confidential Sources

In the course of its investigation, the government utilized two confidential sources to gather information (hereinafter "CS-1" and "CS-2").[11] (First Affidavit ¶¶ 10-12.) CS-1 began

----

[10]Between August 2005 and early 2006 – prior to TFO Goodman's involvement in the investigation – unspecified law enforcement officers attempted to set up controlled purchases of cocaine from Travis Gentry and certain suspected associates. (First Affidavit ¶¶ 14-15.) The affidavits do not discuss any investigation actions between early 2006 and fall 2009, when TFO Goodman first began participating in the investigation.

[11]The affidavits do not identify the gender of CS-1 or CS-2. Instead, "to further protect the identity of the confidential sources, references to the confidential sources, whether they are male or female, [are] referred to by the masculine pronoun." (*See* First Affidavit at p. 6 n.3.) For purposes of this Memorandum, the court will similarly refer to the CS-1 and CS-2 using masculine pronouns.

working for the government in 2009 in exchange for consideration on a potential criminal charge. (*Id.* ¶ 11.) Due to his successful cooperation with law enforcement officers, CS-1 was never charged with the potential criminal offense. (*Id.*) CS-1 had personally met Travis Gentry while working at a gym and had obtained drugs from Gentry in the past for personal use. (*Id.*) During the course of his cooperation with investigators, CS-1 made two controlled purchases of cocaine from Travis Gentry. (*Id.*) In the First Affidavit, TFO Goodman avers that "CS-1 is deemed to be reliable and has provided information to law enforcement which has been corroborated whenever possible through record checks, physical surveillance, and/or other sources of information." (*Id.*) CS-2, who had participated in and/or assisted with Travis Gentry's drug trafficking activities in the past, cooperated with investigators beginning in December 2009. (*Id.*¶ 12.) In the First Affidavit, TFO Goodman similarly attests to CS-2's reliability and states that information provided by CS-2 was "corroborated whenever possible through record checks, physical surveillance and/or other sources of information." (*Id.*) In addition to the section of the First Affidavit specific to CS-1 and CS-2, and as described in more detail herein, the affidavit contains various other references to specific ways in which CS-1 and CS-2 assisted in the investigation and instances in which the government verified the reliability of information they had provided.

d.      Facts Alleged to Establish Probable Cause

In the First Affidavit, TFO Goodman argues that events beginning in December 2009 established probable cause for the wiretap. The early stages of the investigation appear to have been based significantly on information provided by the confidential informants. CS-1 provided law enforcement officers with information concerning Travis Gentry's drug trafficking activities

and made two controlled purchases of cocaine in furtherance of the investigation. For instance, on December 2, 2009, CS-1 informed local law enforcement officers that he had received a call from Travis Gentry to set up a meeting, in which Gentry intended to deliver a sample of cocaine to him. (First Affidavit ¶ 16.) Although this call was not recorded, the government utilized telephone toll records to verify CS-1's representation that Gentry had made the call. (*Id.*) Later that day, Travis Gentry met CS-1 and delivered 5.5 grams of a white powder substance, which the government subsequently verified to be cocaine. (*Id.*) An audio recording of the meeting revealed, among other things, that Travis Gentry inquired into how much CS-1's "guy" was getting for a pound of marijuana and informed CS-1 that his associates had "bricks," which, according to TFO Goodman, was allegedly a reference to kilograms of cocaine. (*Id.*)

In the early stages of the investigation, CS-1 also participated in the following two controlled purchases of cocaine:

- First Controlled Purchase: On December 8, 2009, CS-1 met with Travis Gentry and was provided with 25 grams of a white powder substance that was subsequently confirmed to be cocaine. The First Affidavit explains how the calls made by CS-1 to Travis Gentry to make arrangements concerning the purchase were consensually recorded by law enforcement officers. After receiving official funds to make the purchase as well as a recording and audio device, CS-1 met Travis Gentry at the pre-arranged meet location to complete the transaction. Surveillance officers observed Travis Gentry arrive at the meet location. (*Id.* ¶¶ 17-19.)

- Second Controlled Purchase: On December 18, 2009, CS-1 again met with Travis Gentry and was provided with a plastic baggie of white powder in exchange for official funds given to CS-1. The white powder substance was later confirmed to be cocaine. While the calls arranging this transaction were not recorded, they were verified by telephone toll records. Surveillance officers observed Travis Gentry arrive at the agreed meet location. (*Id.* ¶¶ 20-22.)

CS-1 also engaged in at least one tape-recorded telephone call with Travis Gentry related to Travis Gentry's distribution of cocaine.  (*Id*. ¶ 23.)   CS-2 also provided law enforcement officers with valuable information concerning drug trafficking activities by Travis Gentry and members of the Gentry DTO.  For instance, CS-2 identified several individuals who: (1) supplied cocaine and marijuana to Travis Gentry or purchased those drugs from him; (2) distributed and stored narcotics for Travis Gentry; (3) stored the proceeds of illegal narcotics sales for Travis Gentry; and (4) otherwise facilitated drug trafficking activities by Travis Gentry and the Gentry DTO. (*Id.* ¶¶ 22, 24-29.)

CS-2 also provided specific information concerning the role of Travis Gentry's mother, Betty Gentry, in the drug trafficking activities of the Gentry DTO.  For example, CS-2 informed law enforcement officers that Travis Gentry usually cooked powder cocaine into crack cocaine at the residence of Betty Gentry, with Betty Gentry's knowledge.  (*Id.* ¶ 24.)  According to CS-2, Betty Gentry assisted her son in the distribution of cocaine and allowed him to store drug trafficking paraphernalia, weapons, cocaine, and drug proceeds at her residence.  (*Id.*)  CS-2 also alleged that Betty Gentry (as well as other Gentry family members) was present while cocaine shipments were opened and/or while the bricks of cocaine were broken down into smaller packages.  (*Id.* ¶ 25.)

CS-2 also informed law enforcement officers that he had distributed cocaine for Travis Gentry and had personally met "G," Travis Gentry's California-based cocaine supplier.  (*Id.* ¶¶ 25, 27.)  At Travis Gentry's request, CS-2 had purchased two pre-paid telephones and provided one of them to "G" so that G could communicate with Travis Gentry.  (*Id.* ¶ 28.)  CS-2 also provided details concerning the addresses where "G" shipped cocaine, the method by which the

shipments were made, and the fact that the shipments were sent under fictitious names. (*Id.* ¶ 25.)  For instance, CS-2 alleged that an individual named Spencer Randolph allowed Gentry to use his home as a venue for meetings, to receive drug shipments from California, to ship packages, and to distribute cocaine.  (*Id.* ¶¶ 25-26.)  TFO Goodman later independently verified with the United States Postal Service ("USPS") that Spencer Randolph was, in fact, receiving parcels at his residence that were addressed to fictitious names.  (*Id.* ¶ 26.)

CS-2 also provided specific information to law enforcement officers concerning locations where Travis Gentry was storing the proceeds of his illegal narcotics sales.  For instance, CS-2 stated that Travis Gentry did not possess a bank account and instead was storing his money at the home of his half-brother, Frank Randolph.[12]  (*Id.* ¶ 22, 27.)  A local investigator also informed TFO Goodman that, based on information he had received from various anonymous sources, Frank Randolph indeed holds such proceeds at his residence.  (*Id.* ¶ 22.)  In addition, following the second controlled purchase between CS-1 and Travis Gentry, law enforcement officers followed Travis Gentry from the site of the controlled purchase to Frank Randolph's residence. (*Id.* ¶ 22.)

CS-2 also provided the following information to law enforcement officers, much of which tied Travis Gentry and the Gentry DTO to potential criminal activity and/or assisted law enforcement in its investigation::

- At Travis Gentry's direction, CS-2 had wired $1,000 to an individual in California (*id.* ¶ 27), which CS-2 believed was the state in which Travis Gentry's supplier resided.

_____

[12]Local law enforcement officers also believed that Frank Randolph was Travis Gentry's half-brother.  (First Affidavit ¶ 22.)

- Travis Gentry had paid $20,000 in cash to purchase a white Ford F-150 truck and later had paid to have a hidden compartment installed under the truck's rear seat. (*Id.*)

- Travis Gentry's prior telephone number was (916) 687-1065 and the telephone number of his parent's home was (931) 424-6077. (*Id.* ¶ 28.) Investigators independently confirmed that CS-1 had in fact communicated with Travis Gentry using both of these telephone numbers.

- Frank Randolph maintained a safe in the attic of his home, in which he stored money and guns for Travis Gentry. (*Id.*)

- Travis Gentry and "G" often changed telephones. (*Id.*)

- At Travis Gentry's direction, CS-2 had purchased two pre-paid phones and had provided one of the phones to "G." (*Id.*)

- On February 15, 2010, Travis Gentry provided two contact telephone numbers to CS-2. Later that day, Travis Gentry texted CS-2 to inform him that "916 is off," apparently indicating that his previous telephone number was no longer operative. (*Id.* ¶ 28.)

- On February 19, 2010, CS-2 received a telephone call from (931) 292-3893 (TT1) but did not recognize the number as belonging to Travis Gentry. (*Id.* ¶ 29.) After receiving a second call from TT1, CS-2 had answered and learned that the caller was Travis Gentry. (*Id.*) Travis Gentry informed CS-2 to never call him on TT1 because he used that phone to communicate with "G." (*Id.*) CS-2 informed law enforcement officers that he had heard Travis Gentry speak with "G" while using TT1. (*Id.*) For instance, he had overheard Travis Gentry and "G" discussing how "G" was involved in a drug lord war and "could not get a 'pack' in right now," which, according to TFO Goodman, was a possible reference to cross-border violence along the southwest border of the United States that made it difficult to move drugs across the border. (*Id.*)

- On March 2, 2010, CS-2 placed a recorded call in the presence of a law enforcement officer to Travis Gentry at TT1. (*Id.* ¶ 30.) During the ensuing conversation, CS-2 asked Travis Gentry if he had any marijuana and Gentry responded affirmatively. (*Id.*) Later that day, Travis Gentry met with CS-2 and provided the requested marijuana, which they smoked together. (*Id.*) Telephone toll records confirmed that CS-2's telephone number was in contact with TT1 17 times that day.

- CS-2 informed law enforcement officers that Travis Gentry had continued to contact him using TT1. (*Id.*) Data obtained from a pen register showed that TT1 in fact had been in contact with a telephone used by CS-2 approximately 392 times between April 14, 2010 and May 11, 2010. (*Id.*)

- On April 1, 2010, CS-2 overheard Travis Gentry speaking to an unidentified person over TT1. (*Id.* ¶ 31.) Following the call, Travis Gentry told CS-2 that the unidentified person had a connection in Chicago for cocaine and that he (Travis Gentry) planned to send someone to Chicago to pick up a kilogram of cocaine. (*Id.*)

- On May 10, 2010, CS-2 overheard Travis Gentry speaking with Frank Randolph over TT1, wherein Travis Gentry instructed Randolph to obtain $5,000 of his (Travis Gentry's) money for him to pick up. (*Id.* ¶ 32.) Pen register data for TT1 showed that TT1 was in contact with Frank Randolph's telephone number 5 times on May 10, 2010. (*Id.*) Investigators subsequently established surveillance near Frank Randolph's home and observed Travis Gentry depart Randolph's residence and travel to the home of James Thomas Coffey. (*Id.*)

- Both CS-2 and investigators familiar with the case have believed that Travis Gentry had no other source of income outside of selling controlled substances. (*Id.* ¶ 32.)

### d. Common Call Analysis

CS-2 advised law enforcement officers that Travis Gentry began using TT1 on approximately February 15, 2010. (First Affidavit ¶ 33.) After employing a common call analysis between Travis Gentry's prior telephone number and TT1, the government concluded that Travis Gentry indeed was utilizing TT1 as a replacement for his previous number. (*Id.*) The analysis also revealed that three common numbers utilized by individuals alleged to be members or associates of the Gentry DTO had stopped contacting Travis Gentry's prior telephone number on approximately February 14, 2010 and began contacting TT1 on approximately February 15, 2010 (*id.*) – consistent with CS-2's tip. These three telephone numbers belonged to known or suspected drug traffickers. (Docket No. 33.) As to the first, Brad Yarbrough, a common call

13

analysis confirmed CS-2's tip that the Yarbrough and Travis Gentry were in contact on a daily basis.  (*Id.* at part (a)).  As to the second, Cedric Henderson, CS-2 alleged that he had overheard conversations between Henderson and Travis Gentry concerning marijuana transactions, including conversations on TT1, and a common call analysis confirmed frequent contacts between Henderson and TT1.  (*Id.* at part (b)).  As to the third, Spencer Randolph, CS-2 claimed to have overheard conversations between Travis Gentry and Randolph concerning drug trafficking and to have seen Randolph's cell phone number on Travis Gentry's cell phone.  On two occasions, CS-2 informed law enforcement that Travis Gentry was traveling to Randolph's home to pick up controlled substances, and on both of those occasions physical surveillance confirmed that Travis Gentry in fact visited Randolph's home.

The government also analyzed pen register data for TT1 for the period from May 4, 2010 to May 13, 2010. (First Affidavit ¶ 34.)  That analysis also confirmed that Travis Gentry was in frequent contact with individuals believed to be members of the Gentry DTO, including Yarbrough and another individual, Brandon Matthews.  (*Id.*)  CS-2 informed law enforcement officers that Matthews was involved in drug trafficking activities and, on behalf of Travis Gentry, held marijuana at his (Matthews') residence.  (*Id.*)  CS-2 stated that, when he could not locate Travis Gentry for drug shipments, he would contact Matthews to obtain marijuana.  (*Id.*)  In March 2010, Matthews had delivered marijuana to an informant working for local law enforcement, the charges for which were pending when the First Affidavit was filed.  (*Id.*)

e.      Uses of Other Traditional Investigative Techniques

The government employed a variety of traditional investigative techniques before filing the First Application.  These techniques included the use of physical surveillance, pen registers

and toll records, multiple confidential sources, consensual recordings of telephone conversations, controlled drug purchases, tracking devices, pole cameras, and a financial investigation. (*See, e.g.*, First Affidavit ¶¶ 39-47, 51-52, 56-57, 61-64, and 67.) The First Affidavit explains that, while many of these techniques provided useful information, they did not allow the government to meet its investigative goals. (*Id.* ¶ 36.) Specifically, the First Affidavit highlighted the following shortcomings of the traditional investigative techniques that had already been utilized by the government:

- Physical Surveillance (*Id.* ¶¶ 39-44.): According to TFO Goodman, physical surveillance was a limited tool in the context of the investigation, because many of the pivotal members of the drug conspiracy were unidentified, many of the identified residential areas were not conducive to undercover surveillance, and, as a general matter, it is difficult for investigators to conduct effective surveillance where clandestine meetings occur. TFO Goodman also provided specific examples of the limitations on the usefulness of the physical surveillance. For example, in multiple monitored controlled purchases of cocaine from Travis Gentry by CS-1, officers had been unable to observe the actual hand-to-hand exchanges, one of which took place inside an office building.

  Furthermore, Travis Gentry engaged in counter-surveillance efforts, such as attempting to ascertain law enforcement presence before and after completing the second controlled purchase transaction with CS-1. On a separate occasion, officers believed that Travis Gentry appeared to have noticed the law enforcement presence at a motel parking lot.

  Also, attempts to conduct physical surveillance of Travis Gentry at his residence were limited in time and scope and were unlikely to be effective for several reasons. The residence was located in a rural area on a one lane road with few homes in the vicinity. Also, according to CS-2, Travis Gentry's family and friends were living in the area and notified Travis Gentry when they saw suspicious vehicles. Furthermore, Travis Gentry engaged in other activities that had frustrated long-term physical surveillance efforts, including utilizing different vehicles and, according to CS-2, frequently renting hotel rooms in a variety of locations in Tennessee and Alabama.

In the affidavit, TFO Goodman stated his belief that, without the help of wire interceptions, it would be difficult for investigators to link specific meetings with specific drug transactions. Furthermore, without wire interceptions, a surveillance team would likely have had to place a subject on around-the-clock surveillance, which would have increased the chance that officers would be detected by the target subjects.

- <u>Pen Register and Toll Records</u> (¶¶ 45-47): No information gleaned from telephone records, by itself, had allowed agents to identify additional Target Subjects or to understand the internal operations of the drug trafficking organization. In TFO Goodman's experience, drug traffickers often use multiple telephones and change them frequently in order to avoid being detected by law enforcement officers. Furthermore, in an effort to avoid detection, drug traffickers also provide no subscriber information for a phone, use a fictitious name, or list the name of a significant other, family member, or associate as the subscriber. For instance, Travis Gentry had provided no subscriber information for TT1; only through other investigative techniques, including the use of confidential sources, was law enforcement able to determine that Travis Gentry was utilizing TT1. Similarly, certain telephone numbers in contact with TT1 either contained no subscriber information or were listed under likely false names.

- <u>Confidential Sources</u> (¶¶ 51-52): Although CS-1 and CS-2 had provided valuable information concerning Travis Gentry and members of the Gentry DTO, neither source was in a position to provide or obtain the information necessary to further the investigation's goals. CS-1's controlled purchases of drugs would not help dismantle the organization, while CS-2, by virtue of his relationship with Travis Gentry, could only provide after-the-fact information, not real-time intelligence. Furthermore, both CS-1 and CS-2 had expressed concerns regarding their safety, if their cooperation were to become known.

  In the agent's experience, the use of additional confidential sources would have provided only limited results, because drug traffickers generally avoid contact with other traffickers who are arrested or believed to be under investigation. In this regard, TFO Goodman cited two unsuccessful attempts to employ confidential sources in perform controlled purchases with Travis Gentry in 2005 and 2006. In one instance, Gentry refused to sell drugs to the confidential source; in the other, he agreed to make a sale, but did not arrive at the meet location and never returned the confidential source's subsequent calls.

Finally, TFO Goodman stated that law enforcement officers were not aware of any source possessing sufficient access to the internal operations of the organization who, if utilized, could have furthered the goals of the investigation.

- Consensual Recordings (¶¶ 56-57): Although both CS-1 and CS-2 had engaged in consensually recorded telephone conversations with Travis Gentry, the recordings were of limited value when viewed in the context of the entire investigation. Specifically, CS-1 possessed limited knowledge of Travis Gentry's criminal activities and did not know or have access to other individuals in the drug trafficking organization. Moreover, CS-2 was employed by Travis Gentry to perform smaller tasks within the organization and, therefore, was not necessarily privy to all information concerning the upper echelon members of the organization. The First Affidavit further represented that the consensually recorded and/or monitored telephone calls were limited to discussions with Travis Gentry concerning upcoming drug purchases and/or transfers.[13]

- Tracking Devices (¶¶ 61-62): TFO Goodman states that the use of tracking devices on vehicles utilized by Travis Gentry and members of the Gentry DTO posed a risk of exposing the investigation, because there was evidence that members of the Gentry DTO had installed a trap in which to conceal controlled substances and/or the proceeds of illegal narcotics

---

[13]This representation appears to be inconsistent with the representation that CS-2 was limited to providing only after-the-fact information (*see* Goodman Affidavit ¶ 51). Indeed, in some instances, CS-2 did provide information that was actionable in real time. (*See, e.g.*, *id.* ¶ 30 (discussing consensually recorded phone call between CS-2 and Travis Gentry)). However, in other instances, it appears that CS-2 was limited to providing after-the-fact information. (*See, e.g.*, ¶ 32 (describing police corroboration of CS-2 tip after the fact)). Regardless, the fact that CS-2 prospectively was able to provide *some* useful information did not preclude the government from demonstrating the limitations on CS-2's ability to provide information concerning the nature, scope, and participants in the Gentry DTO's allegedly complex drug trafficking activities, sufficient to establish necessity. *See United States v. Wolcott*, No. 11-5693, 2012 WL 2086944, at *3-*4 (6th Cir. June 8, 2012) (not submitted for publication) (finding that, even where "[c]ontinued reliance on CS-12 might have led the government to more of the big-picture information it sought, . . . the government also offers persuasive reasons why such an approach would have been inadequate," in part due to the limited role of the confidential informant in the alleged criminal operation under investigation). For example, as in *Wolcott*, the Goodman Affidavit represented that, because of CS-2's position within the Gentry DTO and inability to further infiltrate it, CS-2 was limited in his ability to provide information concerning the nature and scope of the Gentry DTO. At any rate, even accepting the fact that CS-2 was able to provide some actionable information, the government plainly made the requisite showing of necessity for the reasons discussed herein.

sales.[14]  While agents had tried to use a tracking device on one of Travis
Gentry's vehicles, the device had often failed to provide a tracking signal,
due to the remote location of Travis Gentry's residence.

- Pole Cameras (¶¶ 63-64):  Video surveillance through the use of pole
  cameras had been of limited evidentiary value, because Travis Gentry and
  members of the Gentry DTO performed their activities inside their homes
  or in other clandestine locations.  Although agents had set up a video
  camera pointed in the direction of Spencer Randolph's residence, it had
  failed to provide the desired evidence.

- Financial Investigation (¶ 67):  Although law enforcement officers
  initiated a financial investigation of Travis Gentry and the members of the
  Gentry DTO, TFO Goodman did not believe that such an investigation
  would dismantle the organization, because the investigation had revealed
  that Travis Gentry did not possess a bank account and generally used only
  cash in his daily transactions.  As of the date of the First Affidavit, the
  financial investigation had not provided investigators with any new
  criminal leads that could be used to dismantle the entire organization.

    f.    Why Other Investigative Techniques Were Not Utilized

The First Affidavit also states that various other investigative measures were

considered but not attempted, for the following reasons:

- Grand Jury Subpoenas: Based on TFO Goodman's experience, the use of
  grand jury subpoenas would not have been effective at that stage in the
  investigation.  He notes that, because investigators have not identified all
  of the drug trafficking organization's members, agents lacked the ability to
  serve subpoenas on every member.  Regardless, co-conspirators would
  most likely be uncooperative and/or invoke their Fifth Amendment
  privilege not to testify.  Furthermore, granting immunity would have been
  unwise because it could have foreclosed prosecution of the conspiracy's
  most culpable members.  Serving grand jury subpoenas would also have
  alerted other members of the drug trafficking organization to the
  investigation's existence, causing them to potentially flee the jurisdiction,
  inform others, threaten the confidential sources, or otherwise compromise
  the pending investigation.  TFO Goodman was unaware of any capable or

_____

[14]Although not stated within the Goodman Affidavit, the court presumes that the "trap"
was located in an area of the car in or close to where a tracking device would be installed,
creating a risk that, in accessing the trap, Travis Gentry or another member of the Gentry DTO
might spot the tracking device.

willing non-target witness to provide grand jury testimony concerning the activities of the Gentry DTO who was high enough in the organizational hierarchy to identify all of its members and reveal its internal operations.

- Undercover Agents:  Based on TFO Goodman's experience, drug traffickers are inherently suspicious of individuals whom they do not know.  This especially is true for those members placed at higher levels of the organizational hierarchy.  With respect to the investigation, the Gentry DTO consisted of a group of close-knit members, some of whom were family members.  Even if an undercover agent were successfully introduced into the organization, there was no evidence suggesting that such an individual would have been able to infiltrate the organization to any greater extent than the two confidential sources already in place.

- Interview of Witnesses or Subjects/Arrest Warrants:  According to TFO Goodman, the most knowledgeable subjects were also participants in the crimes that are under investigation, would be unlikely to cooperate, and may have alerted other members in the organization, thus compromising the investigation.  For similar reasons, seeking arrest warrants would have been premature.

- Search Warrants: Based on his experience, TFO Goodman believed that use of search warrants was unlikely to generate sufficient evidence to determine the full nature and scope of the criminal conspiracy, the identity of its participants, or its internal operations.  The execution of search warrants would have alerted target subjects to the existence of this investigation, causing them to curtail or conceal their activities and bringing the investigation to a premature conclusion.  Although law enforcement officers had identified the residences of several members involved in the drug trafficking organization and several stash locations, they had yet to identify the residences of all members of the Gentry DTO, all locations where drugs or drug proceeds were received, processed, packaged or stored, and all locations where drugs or drug proceeds were stored by the sources of supply.  According to TFO Goodman, it would be more productive to execute search warrants at the end of the investigation, after all of the aforementioned locations had been identified and the goals of the investigation had been substantially achieved.  Furthermore, even if agents attempted to execute search warrants, any records not already destroyed by Travis Gentry would have been difficult to interpret, since records related to drug trafficking activities are often written in code.  Thus, such records would have possessed little significance to the investigation without additional knowledge of their relationship to the organization's drug trafficking activities.

- Trash Searches: While law enforcement officers had identified the residences of several members of the Gentry DTO, they had not employed trash searches at those locations out of fear of potential detection. TFO Goodman stated that, even if such searches were conducted, they would likely have provided only limited information regarding the organization's criminal activities, because it was not likely that either Travis Gentry or other members of the Gentry DTO would discard incriminating materials in their trash containers. In his experience, drug traffickers take pains to destroy potentially incriminating evidence and rarely use their trash receptacles to discard valuable information concerning their activities.

## 2. Subsequent Affidavits

Subsequent affidavits executed by TFO Goodman in support of the successive wiretap applications added additional targets to the investigation (including defendant Smith in the Second Application) and, in most respects, proceeded in the same format as the First Affidavit. They also asserted additional facts believed to establish probable cause, including information gleaned from, *inter alia*, intercepted conversations, confidential informants, and physical and remote surveillance, including the following evidence:

- Physical Surveillance: Third Affidavit (description of physical surveillance at Spencer Randolph's house, where investigators partially confirmed CS-2's tip, but were unable to observe any potential drug exchanges); Fourth Affidavit (describing physical surveillance efforts at McCutcheon's residence, which were limited because McCutcheon is paranoid and lives in a dense residential subdivision); Fifth Affidavit (relating that investigators confirmed through intercepted calls on TT4 that McCutcheon was aware of and concerned about unknown vehicles parked near her residence); Sixth Affidavit (describing how investigators overheard McCutcheon on TT4 discussing detection of law enforcement presence at site of potential cocaine transaction); Seventh Affidavit (stating that, during an intercepted call on TT4, McCutcheon indicated that someone had told Spencer Randolph about law enforcement surveillance at Randolph's residence); Eight Affidavit (stating that, despite surveillance, law enforcement was unable to uncover the identity of "G" at an arranged meeting place).

- Pen Register and Toll Records: Third Affidavit (noting that, because Travis Gentry changed cell phones so frequently, it was difficult for investigators to obtain subscriber and toll record information to timely

prepare wiretap affidavits); Fourth Affidavit (stating examples of phones operated by suspected Gentry DTO numbers under false names); Fifth Affidavit (same); Sixth Affidavit (same).

- Confidential Sources: Fourth Affidavit (stating that CS-1 could not provide any information about McCutcheon and that CS-2 lacked the ability to obtain drugs from McCutcheon, and that CS-2 could only provide information immediately prior to an event, thereby frustrating efforts to set up effective physical surveillance); Fifth Affidavit (noting that CS-2 had temporarily stopped cooperating due to a jail sentence); Sixth Affidavit (stating that, although CS-2 had resumed cooperating, CS-2 was unable to deal directly with "G" or those supplying him); Seventh Affidavit (noting that CS-2's position within the Gentry DTO had not improved).

- Undercover Agents: Fourth Affidavit (stating that affiant was not aware of any person who could successfully introduce an undercover agent to McCutcheon).

- Consensual Recordings: Fourth Affidavit (stating that CS-1 had no knowledge of McCutcheon's criminal activities and could not contact her or her associates directly).

- Interview of Witnesses or Subjects/Arrest Warrants: Third Affidavit (stating that two arrested target subjects had expressed no willingness to assist the investigation); Sixth Affidavit (after arrest of another target subject, subject expressed willingness to cooperate, but was deemed unreliable by investigators when, following his release, he contacted McCutcheon for more drugs); Seventh Affidavit (stating that another arrested target subject had not expressed any willingness to assist the investigation); Eighth Affidavit (after his arrest, Travis Gentry refused to cooperate with law enforcement officers).

- Tracking Devices: Fourth Affidavit (stating that investigators had not been presented with opportunity to install tracking device on McCutcheon's vehicle); Seventh Affidavit (stating that investigators had installed tracking device on Channing Randolph's vehicle, but device had not led to significant intelligence or law enforcement action).

- Pole Cameras: Third Affidavit (stating that Travis and members of Gentry DTO conducted activities inside vehicles, outside view of pole camera, and after dark, and that pole camera outside Spencer Randolph's residence had failed to produce desired evidence, such as identities and/or roles of conspirators); Fourth Affidavit (noting McCutcheon had conducted her

activities in clandestine locations and often after dark); Seventh Affidavit (stating that, despite identifying drug-related meetings at Spencer Randolph's residence through wiretap, investigators were unable to corroborate meeting participants utilizing pole camera).

- Trash Searches: Fifth Affidavit (stating that Gentry DTO members detected (unspecified) law enforcement surveillance near McCutcheon's home, underscoring risks of performing trash search); Seventh Affidavit (stating that trash search at Channing Randolph's residence had been conducted, but that search had yielded no incriminating evidence).

## C.    Necessity

Title III requires that an application for a wiretap order contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting 18 U.S.C. § 2518(1)(c)).  This statutory requirement is designed "to ensure that a wiretap 'is not resorted to in a situation where traditional investigative techniques will suffice to expose the crime.'"  *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 152 n.12, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974)). The Sixth Circuit has defined the relevant standard for assessing the adequacy of the "needs statement" in an application as follows:

> Wiretaps are not to be used thoughtlessly or in a dragnet fashion.  As our court has said, *what is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigations.*  However, the government is not required to provide that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted.

*United States v. Giacalone*, 853 F.2d 470, 480 (6th Cir.1988) (quoting *Alfano,* 838 F.2d at 163) (internal citations and quotations omitted) (emphasis added).  Indeed, "the burden of showing necessity is not a heavy one."  *United States v. Rice*, 478 F.3d 704, 716 (6th Cir. 2007).  A wiretap need not be used only as a last resort.  *Landmesser*, 553 F.2d at 20.  Thus:

All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

*Giacalone*, 853 F.2d at 480 (quoting *Alfano*, 838 F.2d at 163-64). At the same time, "[w]hile the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be inadequate compliance with the statute." *Rice*, 478 F.3d at 710 (quoting *Landmesser*, 552 F.2d at 20). In determining whether an application meets the necessity requirement, a "reasonable statement of the consideration or use of other investigative means is adequate." *Alfano*, 838 F.2d at 164. The court must evaluate the showing "in a practical and common sense fashion." *Landmesser*, 553 F.2d at 19-20.

Here, the government plainly made the requisite showing to the Issuing Judge. The government had actively investigated Travis Gentry and the Gentry DTO for at least six months before filing its First Application for a wiretap. During that time period, the government utilized a host of traditional investigative techniques, including physical and remote video surveillance, controlled drug purchases, pen register and telephone toll record analysis, the development of two confidential sources, consensually recorded telephone calls, the use of a tracking device to attempt to track Travis Gentry's movements, and financial investigations. Subsequent affidavits provided updates concerning the progress of the investigation and the continuing use of many of these investigative techniques, to the extent such techniques were feasible. Contrary to the defendants' contention, these facts demonstrate that the wiretap applications plainly did not constitute the "initial step" in the government's investigation into Travis Gentry and the Gentry

DTO.  Instead, they reflected the culmination of months of coordinated efforts by law enforcement officers to investigate Travis Gentry and the Gentry DTO using various traditional investigative techniques.

All of the affidavits also substantially explained the limitations accompanying the traditional investigative techniques that the government had already utilized.  For instance, the First Affidavit provides case-specific information concerning the challenges involved in investigating Travis Gentry and the Gentry DTO, such as: (1) the limitations on physical and remote surveillance due to the location of Travis Gentry's house on a one-lane road in a rural area monitored by family members, the manner in which Travis Gentry conducted clandestine drug transactions, and his efforts to conduct counter-surveillance; (2) the limits on actionable information recoverable from pen registers and toll records due to Travis Gentry's use of a prepaid telephone lacking any subscriber information and his frequent switching of telephones; (3) the inability of confidential sources to provide information concerning the upper end of the Gentry DTO hierarchy and to conduct effective consensually recorded telephone calls, due to their lower position in the organization, as well as their fear of reprisal; (4) the inability of a tracking device to function effectively due to the remote location of Travis Gentry's residence; and (5) the limitations on the financial investigation, once it was discovered that Travis Gentry did not have a bank account and conducted most transactions in cash.  The affidavits attached to subsequent wiretap applications similarly provide sufficient detail concerning the limitations of these and other traditional investigative techniques.  *See Wolcott*, 2012 WL 2086944, at *3-*4 (finding that necessity requirement was met, where, *inter alia*, (a) confidential informant was only a low-level participant in criminal operation and (b) physical surveillance was likely

inadequate, because potential targets lived in rural areas with limited traffic, thereby creating a risk of detection, and law enforcement had been unable to identify addresses of suspected leaders).

The First Affidavit and subsequent affidavits also demonstrate that the government gave "serious consideration" to other investigative techniques that were considered, but not employed. The issuing court may rely on the reasoned judgments of an appropriately experienced affiant that employing certain investigative techniques, including grand jury subpoenas, the issuance of search warrants, undercover agents, witness interviews, and trash searches, risk compromising the entire investigation by tipping off the subjects of the potential investigation and/or would not generate the information sought. *See, e.g.*, *United States v. Haque*, 315 F. App'x 510, 518 (6th Cir. 2009) (upholding wiretap, where authorities utilized confidential informants, pen registers, trap and trace techniques, and physical surveillance, but did not utilize undercover agents or a grand jury investigation because those methods were "unlikely to uncover the information the FBI was after and, moreover, risked tipping off the targets to the investigation"); *United States v. Walkup*, No. 1:09-CR-00026-R, 2010 WL 4778788, *1-*4 (W.D. Ky. Nov. 16, 2010); *United States v. Hawk*, No. 3:05CR-151-S, at *1-*5 (W.D. Ky. Oct. 22, 2007); *United States v. Kelley*, 596 F. Supp. 2d 1132, 1143-48 (E.D. Tenn. 2009); *United States v. Hazelwood*, No. 1:10 CR 150, 2011 WL 2553265, at *5-*9 (N.D. Ohio June 28, 2011). Here, in support of the First Affidavit, TFO Goodman drew on his knowledge and prior investigative experience in explaining why these alternative techniques were unlikely to be effective in the context of the investigation, including case-specific information, such as the difficulty that would be inherent in attempting to place an undercover agent into the Gentry DTO, a tight-knit organization that

included various family members. In the subsequent affidavits, TFO Goodman provided similarly detailed information, based on his knowledge and experience and case-specific information, as to the limits on these investigative techniques.[15]

In support of their Motion to Suppress, the defendants appear to argue that the government was essentially required to exhaust all traditional methods of investigation prior to seeking authorization to conduct a wiretap. However, under established Sixth Circuit precedent, the government's burden is not so extreme, *see Giacalone*, 853 F.2d at 480 ("[T]he government is not required to provide that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted.") (quoting *Alfano,* 838 F.2d at 163), and the court must accord "great deference" to the Issuing Judge's determination concerning necessity. *See Corrado*, 227 F.3d at 539-40; *see also Wolcott*, 2012 WL 2086944, at *3 ("[T]he government 'need not prove the impossibility of other means of obtaining information,' and, relatedly, 'the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance.'") (quoting *Stewart*, 306 F.3d at 305).

Accordingly, under the applicable legal standard and showing the requisite "great deference" to the Issuing Judge's determination, the court finds that the Issuing Judge was presented with a substantial showing of necessity in connection with all of the government's wiretap applications.

---

[15]Indeed, subsequent events confirmed many of TFO Goodman's initial beliefs, as expressed in the First Affidavit, regarding the limitations on certain investigative techniques with respect to Travis Gentry and the Gentry DTO. For example, McCutcheon and Spencer Randolph became aware of law enforcement's surveillance efforts, multiple target subjects arrested for drug offenses (including Gentry himself) failed to cooperate with law enforcement, and a trash search at Channing Randolph's residence failed to yield any incriminating evidence.

**D.      Probable Cause**

1.      <u>Applicable Legal Standard</u>

To establish probable cause for a wiretap, the issuing judge must determine whether the facts alleged in the application create probable cause to believe that: (1) an individual has committed, is committing, or is about to commit the offense charged; (2) communications concerning the offense will be obtained through the requested surveillance; and (3) the location of the electronic surveillance has been used, is being used, or will be used in the commission of the offense, or is leased to, listed in the name of, or commonly used by the individual suspected of committing the offense.  *Giacalone*, 853 F.2d at 478 (citing 18 U.S.C. §§ 2518(3)(a), (b), and (d)).  In determining whether the evidence supporting a wiretap warrant meets this probable cause standard, "there is no specific formula that must be met . . . , and . . . evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner."  *Giacalone*, 838 F.2d at 478 (quoting *Alfano*, 838 F.2d at 161) (internal citation omitted).  The question that must be decided in issuing a warrant is whether there is probable cause to believe that a crime will be uncovered.  *Id.*  "Under this standard, certainty is not required at this stage, and the exact quantum of support required has frequently been described as 'a fair probability,' but more than a 'mere suspicion' that such evidence will be discovered."  *Id.*  Accordingly, "[f]acts can amount to a fair probability without being proof beyond a reasonable doubt or even a *prima facie* showing."  *Id.*  Thus, "the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination . . . . [A] magistrate's determination on the question of probable cause will not be reversed if the record contains a 'substantial basis for his probable cause findings.'"  *Giacalone*, 853 F.2d at 479 (internal

citations omitted) (quoting *Alfano*, 838 F.2d at 162); *see also United States v. Archibald*, --- F.3d ---, 2012 WL 2816702, at *2 (6th Cir. July 11, 2012) (submitted for publication).

Here, the defendants contend that the affidavits provided in support of each wiretap application failed to establish probable cause. In particular, the defendants argue that the affidavits were "bare bones" affidavits, that the affidavits fail to link Betty Gentry and Smith to the alleged criminal activity described in the affidavits, and/or that the affidavits contained information from confidential sources whose credibility and veracity were not shown.

### 2. Substance of the Affidavits

As an initial matter, the affidavits at issue here were plainly not "bare bones" affidavits. "An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge is a 'bare bones' affidavit." *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996). Here, as detailed herein, each affidavit provides detailed information concerning, *inter alia*: TFO Goodman's extensive local background and experience concerning drug trafficking; facts gleaned from demonstrably reliable confidential sources (*see infra*); excerpts from consensually recorded and monitored telephone calls and text messages involving Travis Gentry or suspected members of the Gentry DTO; descriptions of physical and remote surveillance efforts; the (unsuccessful) attempt to utilize a tracking device on one of Travis Gentry's vehicles; the results of pen register and toll analyses, including contacts between the target telephone(s) and numbers belonging to suspected members or associates of the Gentry DTO and/or individuals convicted of or suspected of drug trafficking activities; the substance of multiple actual or attempted controlled drug purchases; the (limited) information gleaned from a pole camera directed at Spencer Randolph's residence; and, as to affidavits after the First Affidavit, excerpted conversations from intercepted

phone calls.  Furthermore, the First Affidavit and all subsequent affidavits provide specific details concerning how Travis Gentry and other members of the Gentry DTO had sought to limit potential law enforcement investigatory efforts.  For example, the First Affidavit details how Travis Gentry frustrated investigatory efforts through counter-surveillance and frequently switching phones, vehicles, and residences (from hotel to hotel).  Thus, the affidavits clearly provided the Issuing Judge with more than just TFO Goodman's "beliefs and conclusions"; to the contrary, the affidavits contain substantial case-specific information upon which TFO Goodman reasonably based his beliefs and conclusions.

As to the defendants' conclusory argument that the affidavits fail to link Betty Gentry and Smith to the alleged criminal activity, that contention both misconstrues the applicable legal standard and, in any case, is without merit.  First, the affidavits sought to tap the phones of *Travis Gentry* and *Kejuana McCutcheon*, not Betty Gentry or Smith.  The burden was on the government only to show to the Issuing Judge that, *inter alia*, the target telephones utilized by Travis Gentry and McCutcheon had been used, were being used, or would be used in the commission of the alleged offenses, or were leased to, listed in the name of, or commonly used by *"the individual[s] suspected of the offense*," *see Giacalone*, 853 F.2d at 478 (citing 18 U.S.C. §§ 2518(3)(a), (b), and (d)) (emphasis added) – in this case, Travis Gentry and McCutcheon. Indeed, the affidavits contained substantial information regarding drug trafficking activities by Travis Gentry and McCutcheon, whose phones the investigators were seeking to wiretap, thereby providing a substantial basis for the Issuing Judge to have determined that probable cause was established for each wiretap application.  Thus, regardless of its merits, the defendants' argument that the affidavits did not sufficiently link Betty Gentry and Smith to the Gentry DTO is essentially irrelevant to whether there was probable cause for each wiretap.

At any rate, even if this consideration were relevant, the affidavits did provide sufficient evidence to establish probable cause that Betty Gentry and Pat Smith had engaged in drug trafficking activities subject to the investigation. With respect to Betty Gentry, the First Affidavit articulates information from CS-2, a reliable confidential source (*see infra*), concerning Betty Gentry's role in assisting Travis Gentry in his drug trafficking activities. The affidavit provides evidence that Betty Gentry knowingly permitted Travis Gentry to utilize her residence for drug trafficking activities, including the storage of weapons, cocaine, and drug proceeds. Furthermore, the affidavit provides evidence that Betty Gentry was present with Travis Gentry when cocaine shipments were opened at her residence and broken down into smaller packages for distribution. These allegations link Betty Gentry directly to drug trafficking activity by Travis Gentry, who used the telephone subject to the First Application. (*See* First Affidavit ¶¶ 24-25.) With respect to Smith, who was not listed as an investigatory target until the Second Application – *i.e.*, following the initial wiretap of TT1 – the Second Affidavit contains evidence (provided by CS-2) describing Pat Smith's roles as a drug purchaser and supplier of cocaine to Travis Gentry. Specifically, the Second Affidavit states that Smith planned to use one of Travis Gentry's vehicles with a hidden compartment to obtain cocaine for Travis Gentry, that Smith operated as an alternative source of supply of cocaine to the Gentry DTO, and that Smith often provided cocaine to Travis Gentry to break down into crack cocaine. (Second Affidavit ¶ 33.)[16]

   3.   Reliance on Confidential Sources

---

[16]The defendants also contend, in conclusory fashion, that the affidavits failed to link unspecified "other" defendants to drug-related criminal activity. To the contrary, the First Affidavit contained substantial information linking multiple individuals to drug trafficking activity, and, as the investigation progressed, the affidavits provided evidence linking additional target subjects to the drug trafficking activities under investigation.

a.      Applicable Legal Standard

The defendants argue that it was improper for the Issuing Judge to rely on any information provided by CS-1 and CS-2 in making a probable cause determination.  The defendants' argument focuses on information contained within the First Affidavit only.  (Docket No. 863 at p. 60.)

Before issuing a warrant based on hearsay information provided by confidential sources, the issuing judge must have evidence that establishes the veracity, reliability and basis of knowledge of those sources.  *Archibald*, 2012 WL 2816702, at *3; *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000).  Where, as here, a warrant affidavit provides no indicia of an informant's previous reliability, the affidavit must contain substantial independent corroborating information.  *Archibald*, 2012 WL 2816702, at *3 ("[E]ven an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, if it includes sufficient corroborating information") (quoting *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2004)); *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005); *see also United States v. Lawson*, No. 10-4256, 2012 WL 806393, at *2 (6th Cir. Mar. 13, 2012) (not submitted for publication) (to establish probable cause, "police may rely on information from confidential informants, if 'sufficiently detailed and corroborated by the independent investigation of law enforcement officers") (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)); *United States v. Patrick*, No. 1:08-CR-130, 2009 WL 1766259, at *3-*4 (E.D. Tenn. June 23, 2009) (applying *Frazier* standard to review of wiretap application).  Furthermore, "an 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's tip] to greater weight than might otherwise by the case.'" *Archibald*, 2012 WL 2816702, at *3 (quoting *Weaver*, 99 F.3d at 1377).  The affidavit

"should be judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Independent police corroboration can take many forms. For instance, a single police-monitored controlled purchase of drugs by the informant provides sufficient independent corroboration of an informant's reliability. *Archibald*, 2012 WL 2816702, at *3 (finding that officer's affidavit supported probable cause finding, "even after only one controlled buy"); *United States v. Coffee*, 434 F.3d 887, 891-96 (6th Cir. 2006) (finding that probable cause was established, where informant conducted a single controlled purchase of drugs from alleged drug distributor subject to warrant application); *United States v. Gunter*, 266 F. App'x 415, 417-418 (6th Cir. 2008) (finding that the reliability of an informant was established, where informant conducted two controlled drug purchases from alleged drug distributor, because, "[i]f one such purchase was sufficient to corroborate an informant's statements in *Coffee*, then two purchases will more than suffice in the instant case"); *United States v. Jackson*, 470 F.3d 299, 307-08 (6th Cir. 2006) (controlled purchase of drugs by unnamed confidential source demonstrated reliability of informant, and, therefore, the "magistrate's finding of probable cause was based on the affiant's personal knowledge and observations, rather than hearsay of the informant.")

Similarly, where an informant provides information that is consistent with information already independently known to the affiant, or where subsequent investigation confirms the information provided by the informant, the reliability of the informant may be established. *See United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000) (finding that reliability of informant was independently corroborated, where informant's tip that defendant was utilizing stolen parts at auto shop was consistent with information already independently known to law enforcement);

*United States v. McNally*, 327 F. App'x 554, 557-78 (6th Cir. 2009) (where informant alleged that defendant was involved in child pornography, independent corroboration of informant's reliability was established where investigator independently verified the alleged residential and business addresses of the defendant, his alleged employer, and the alleged existence of restraining order against him in favor of the informant).

Here, the First Affidavit provided substantial evidence of independent corroboration of information provided by both CS-1 and CS-2, sufficient to support the Issuing Judge's reliance on information provided by CS-1 and CS-2 in making a probable cause finding..

        b.     CS-1

The First Affidavit indicated that, after CS-1 claimed to have received a call from Travis Gentry on December 2, 2009 related to drug trafficking, law enforcement officers independently verified through telephone toll records that CS-1's phone had in fact received a call from Travis Gentry's cell phone on that date. Following that call, CS-1 informed investigators that Travis Gentry would be supplying him with a cocaine sample later that day in the hope that it would assist CS-1 in locating a buyer for larger amounts of cocaine. As independently confirmed by an audio recording, CS-1 in fact met with Travis Gentry, the two discussed drug trafficking, and Travis Gentry provided CS-1 with a cocaine sample, which a DEA lab analysis confirmed was nearly pure cocaine. Furthermore, at the direction of law enforcement, CS-1 engaged in two controlled purchases of cocaine from Travis Gentry. The affidavit describes how many of the calls placed by CS-1 to Travis Gentry to set up these purchases were either monitored by law enforcement, consensually recorded, or independently verified. Law enforcement officers also conducted surveillance at each of the pre-arranged meet locations between CS-1 and Travis Gentry, and later lab testing confirmed that Travis Gentry had indeed sold cocaine to CS-1 on

these occasions.  Even these two controlled purchases, standing alone, were sufficient to establish CS-1's reliability.  *Gunter*, 266 F. App'x at 417-418.  At any rate, the various examples of police corroboration of CS-1's reliability, including the controlled drug purchases, were sufficient to support reliance by the Issuing Judge on information provided by CS-1 in reaching a probable cause determination.

c.     CS-2

The First Affidavit overwhelmingly demonstrated CS-2's veracity, reliability, and basis of  knowledge.  First, the affidavit contains numerous examples in which investigators independently corroborated new information provided by CS-2.  For example, after CS-2 informed investigators that Spencer Randolph was receiving cocaine shipments under fictitious names, investigators confirmed that the USPS had in fact delivered parcels to Spencer Randolph's residence under the fictitious names "Randall Spencer" and "Spencer Randall." Investigators also utilized pen register data and/or physical surveillance to confirm CS-2's representations that Travis Gentry was utilizing TT1 to speak with him.  Similarly, after CS-2 had claimed that Travis Gentry had utilized TT1 to call Frank Randolph to inform him that he (Travis Gentry) was on his way to pick up $5,000, pen register data reflected that phone call and physical surveillance confirmed that Travis Gentry in fact visited Frank Randolph's residence that day.  Similarly, after CS-2 had advised investigators that Travis Gentry was on his way to Spencer Randolph's residence to pick up controlled substances, surveillance confirmed that Travis Gentry in fact visited that residence on those dates.  Telephone records also confirmed CS-2's tips that Travis Gentry began utilizing TT1 on approximately February 15, 2010, and that a convicted drug trafficker had been calling Travis Gentry on a daily basis.

Second, the First Affidavit also recites instances in which CS-2 provided information that was independently consistent with information already known to law enforcement.  For example, CS-2 informed investigators that Travis Gentry hides the proceeds of his narcotics sales at the home of Frank Randolph.  This information was already known to TFO Goodman, as a local investigator had also informed him that Frank Randolph holds drug proceeds at his residence for Travis Gentry.

Third, CS-2 also provided information based on personal knowledge, as opposed to mere hearsay.  For instance, CS-2 stated that he personally observed and/or participated in drug trafficking activities involving Travis Gentry and the Gentry DTO.  For example, CS-2 claimed that he (1) met "G," a California-based cocaine supplier to Travis Gentry, on numerous occasions and supplied a telephone to "G" at Gentry's request; (2) distributed cocaine for Travis Gentry; (3) met Travis Gentry at a motel in Alabama, where Travis Gentry provided him with marijuana that they both smoked together; (4) saw the phone number of an individual believed to be a member of the Gentry DTO appear on the caller identification feature of Travis Gentry's cell phone; and (4) contacted Brandon Matthews, an alternative drug distributor for Travis Gentry, when he was unable to reach Travis Gentry.  These and other detailed observations of alleged wrongdoing were based on CS-2's personal knowledge, which is entitled "to greater weight than might otherwise be the case," *Archibald*, 2012 WL 2816702, at *3.

Taken collectively, the First Affidavit provided ample indicia of CS-2's reliability, veracity, and basis of knowledge.

Thus, under the totality of the circumstances, and showing the requisite deference to the Issuing Judge's determination, the court finds that the First Affidavit provided more than sufficient evidence to the Issuing Judge to establish the veracity, reliability, and bases of

knowledge of CS-1 and CS-2. Therefore, the Issuing Judge reasonably relied upon information provided by CS-1 and CS-2 in reaching a determination that the First Affidavit and subsequent affidavits established probable cause for the requested wiretaps.

In sum, having determined that the affidavits established the requisite showing of necessity and probable cause, the court will not suppress evidence gleaned from the wiretaps.

## **CONCLUSION**

For the reasons stated herein, the Motion to Suppress will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge